UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, INC., <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF JUSTICE, <br><br> Defendant. | Civil Action No. 11-1121 (BAH) <br><br> Judge Beryl A. Howell |

**MEMORANDUM OPINION**

Plaintiff Judicial Watch, Inc. brings this action against the United States Department of Justice ("DOJ") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, seeking injunctive relief. Pursuant to the FOIA, the plaintiff requested records from the defendant relating to the alleged criminal investigation and prosecutorial deliberations regarding a man named Omar Ahmad, who is a co-founder of an organization called the Council on American Islamic Relations ("CAIR"). In response to the plaintiff's FOIA requests, the defendant refused to confirm or deny the existence of certain categories of potentially responsive records, and the issue before the Court is whether those responses were appropriate under the FOIA.

**I.   BACKGROUND**

    **A.   Holy Land Foundation Prosecution**

On November 30, 2005, a federal grand jury charged an organization called Holy Land Foundation for Relief and Development ("HLF") and several of its executives with 42 criminal counts for their alleged material support to Harakat al-Muqawamah al-Islamiyya ("Hamas")—a group that the United States government considers a terrorist organization. *See* Superseding Indictment, *United States v. Holy Land Found. for Relief & Dev.*, No. 3:04-CR-240 (N.D. Tex.

1

Nov. 30, 2005), ECF No. 233. In prosecuting the case, the United States submitted a "List of Unindicted Co-Conspirators and/or Joint Venturers," which contained the names of 246 individuals and organizations "'for which [the Government] intended to prove were engaged in supporting Hamas.'" Pl.'s Mem. P. & A. Opp'n to Def.'s Mot. Summ. J. & Supp. Pl.'s Cross-Mot. Summ. J. ("Pl.'s Opp'n") at 3, ECF No. 13 (quoting Decl. of Michael Bekesha ("Bekesha Decl.") Ex. A at 5, ECF No. 13-1). The list was not originally filed under seal and was available to the public for some period of time before being placed under seal by the Texas district court. *See* Def.'s Response to Pl.'s Statement of Material Facts Not in Dispute ("Def.'s SMF Response") ¶ 3–4, ECF No. 18; Pl.'s Statement of Material Facts Not in Dispute ("Pl.'s SMF") ¶ 4, ECF No. 13.

While the pleadings and evidence from the HLF trial were sealed by the Texas court, the parties agree that Omar Ahmad's name appeared in some of the evidence that was introduced during the HLF trial. *See* Pl.'s SMF ¶ 5; Def.'s SMF Response ¶ 5. The plaintiff also contends that Ahmad's name appeared on the "List of Unindicted Co-Conspirators and/or Joint Venturers," though the defendant refuses to confirm or deny that fact.[1]  *See* Pl.'s SMF ¶ 3; Def.'s SMF Response ¶ 3. Five of the defendants, including the HLF, were convicted on all counts in November 2008, and they appealed their convictions to the Fifth Circuit. *See United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011). In reviewing some of the evidence presented at trial, the Fifth Circuit summarized evidence that Ahmad, by virtue of his leadership role in an organization known as the Palestinian Committee, was affiliated with and perhaps helped to

---

[1] Notwithstanding the fact that the list was publicly available when initially filed, the Government's position is that, because the contents of the list have "been sealed by two federal district courts, including this one," it can "neither confirm nor deny whether Omar Ahmed's name was on the list." Def.'s SMF Response ¶ 3.

control the HLF. *Id.* at 530–31.[2]  Despite the apparent existence of evidence connecting Ahmad to the HLF's illegal activities, the government has never formally pursued his prosecution. Pl.'s Opp'n at 5.

In April 2011, Patrick Poole, a journalist and counter-terrorism consultant, published a series of articles and blog posts concerning the Department of Justice's decision not to prosecute Ahmad. Decl. of Patrick S. Poole ("Poole Decl.") ¶¶ 5–11, ECF No. 13-3. Poole states that he based the articles on his conversations with "high-ranking" DOJ officials who spoke to him on the condition of anonymity. *Id.* ¶¶ 12, 14. Poole also states that one of his anonymous sources allowed him to review a copy of a March 31, 2010 memorandum entitled "Declination of Prosecution of Omar Ahmad." *Id.* ¶ 13, 15.

On April 15, 2011, Rep. Peter King, the Chairman of the House Committee on Homeland Security, wrote an open letter to Attorney General Eric Holder regarding the alleged decision not to prosecute Ahmad. *See* Decl. of Vanessa R. Brinkmann ("Brinkmann Decl.") Ex. D, ECF No. 11-1. In the letter, Rep. King asserted that he had been "reliably informed" that "high-ranking officials at Department of Justice" had "usurped" the decision not to file charges against Ahmad over the "vehement and stated objections" of individuals within the FBI and the U.S. Attorney's Office for the Northern District of Texas. *Id.* at 3.

---

[2] In particular the Fifth Circuit stated:

> Wiretap evidence from 1999 further supported an inference that the Palestine Committee was intimately involved in the activities of HLF. For example, two 1999 conversations were intercepted involving Omar Ahmad, who was a member of the Palestine Committee and was also associated with the IAP. Ahmad was neither an employee nor a board member of HLF but he was heard influencing HLF business. In Baker Wiretap No. 33, Ahmad instructed HLF employee Haitham Maghawri, over Maghawri's protest, to send money to Lebanon because Baker had promised to give Ahmad $50,000 for a project there. In another conversation, Ahmad instructed Baker on the compensation to be paid to El–Mezain for his fundraising work. The two men also joked about the telephone being bugged. Because Ahmad had no relationship to HLF other than his connection to the Palestine Committee, his conversations about HLF business and projects suggest that the Palestine Committee controlled HLF even after the designation of Hamas as a terrorist organization.

*El-Mezain*, 664 F.3d at 530–31.

Several days after Rep. King sent his letter, Attorney General Holder held a press conference in Washington, D.C., during which a reporter asked:

> Representative Peter King wrote you a letter earlier this month asking why CAIR and other unindicted co-conspirators in the Holy Land Foundation case were not prosecuted and who ultimately approved the decision. He asked for you to respond yesterday. Who was—why weren't they prosecuted and who was ultimately responsible for making that decision not to prosecute?

Pl.'s SMF ¶ 7. Attorney General Holder replied:

> Well, here's a—people don't have that quite right. I mean the decision wasn't necessarily about CAIR as it was about a guy, a person, an individual. But that being the case, the decision . . . which was reached in this administration, the same that was reached in the Bush Administration, a determination was made that for a variety of reasons, looking at the facts and the law, prosecution would not be appropriate. A review was done of that decision in this Administration and the conclusion was reached that [the] earlier decision was an appropriate one . . . [The final decision] was done by career folks looking at the evidence. And you know, as Attorney General I—if some folks—some people think that my hand's in every decision that's made, especially those they disagree with, but that is not the case.

*Id.*

### B.   FOIA Requests

On May 9, 2011, the plaintiff submitted separate FOIA requests to the defendant's Office of Information Policy ("OIP") and National Security Division ("NSD"). Both requests sought the production of:

a) The March 31, 2010 memorandum entitled "Declination of Prosecution of Omar Ahmad" from Attorney General [sic] David Kris to Acting Deputy Attorney General Gary Grindler.

b) Any and all communications, contacts or correspondence between the Office of the Attorney General ("AG"), the Office of the Deputy Attorney General ("DAG"), or the Office of Associate Attorney General ("Assoc. AG") and the Council on American-Islamic Relations (CAIR) or any CAIR affiliated groups concerning, regarding, or relating to the prosecution or declination of prosecution of Omar Ahmad.

c) Any and all communications, contacts or correspondence between the Office of the AG, the Office of DAG, or the Office of the Assoc. AG and the U.S. Congress concerning, regarding, or relating to the prosecution or declination of prosecution of Omar Ahmad.

4

  d) Any and all communication, contacts or correspondence between the Office of the AG, the Office of the DAG, or the Office of the Assoc. AG and the White House or the Executive Office of the President concerning, regarding, or relating to the prosecution or declination of prosecution of Omar Ahmad.

  e) Any and all communications, contacts or correspondence between the Office of the AG, the Office of the DAG, or the Office of the Assoc. AG and the U.S. Attorney's Office of the Northern District of Texas concerning, regarding, or relating to the prosecution or declination of prosecution Omar Ahmad.

Brinkmann Decl. ¶ 3; Decl. of Mark A. Bradley ("Bradley Decl.") ¶ 2, ECF No. 11-2. The requests covered the time period from January 20, 2009 through May 1, 2011. Brinkmann Decl. Ex. A at 2; Bradley Decl. Ex. A at 2. The plaintiff did not receive a determination from either the OIP or the NSD within twenty working days of filing its FOIA requests, and therefore it filed the instant action on June 17, 2011. *See* Compl. ¶¶ 9, 13, ECF No.1; *see also* 5 U.S.C. § 552(a)(6)(C)(i) (providing for constructive exhaustion of administrative remedies after twenty working days). In an effort to resolve this matter without further action by the Court, the parties agreed that the defendant would continue to process the requests and produce any non-exempt records in its possession by December 5, 2011. *See* Joint Notice of Proposed Produc. Schedule ("Joint Notice") ¶ 2, ECF. 9.

  The OIP and the NSD conducted searches for documents responsive to categories (b) and (c) of the plaintiff's FOIA requests. *See* Brinkmann Decl. ¶ 6; Bradley Decl. ¶ 3. Both components, however, refused to confirm or deny the existence of any records responsive to categories (a), (d), and (e) of the plaintiff's FOIA requests, citing FOIA Exemptions 5, 6, and 7. *See* Brinkmann Decl. Ex. D at 1–2 ("Insofar as you are seeking internal records regarding an alleged prosecutorial decision, I can neither confirm nor deny the existence of any such records."); Bradley Decl. Ex. B at 1 ("To the extent your request concerns a decision to

prosecute and/or decline to prosecute an individual, we are unable to confirm or deny the existence of such records.").

Beginning on July 1, 2011, the OIP searched the electronic database of the Departmental Executive Secretariat, which contains records from January 1, 2001 to the present, using the key words "Omar Ahmad" and "CAIR." Brinkmann Decl. ¶ 7. OIP also initiated an electronic and paper search of the Offices of the Attorney General ("OAG"), Deputy Attorney General ("ODAG"), and Associate Attorney General ("OASG"). *Id.* ¶¶ 8–9. As a result of these searches, the OIP located two responsive documents, which the OIG produced to the plaintiff in full on December 5, 2011. *See id.* Ex. D at 1. The produced documents included the above-referenced letter from Rep. Peter King to Attorney General Holder as well as the defendant's response to Rep. King's letter, authored by Assistant Attorney General Ronald Welch. *See* Brinkmann Decl. Ex. D at 3–5. Likewise, the NSD asked all personnel of the Office of the Assistant Attorney General ("OAAG") to search their paper and electronic files for responsive records. Bradley Decl. ¶ 3. The NSD's search located only one responsive record—the same April 15, 2011 letter from Rep. King to Attorney General Holder. *Id.* The NSD did not perform a search of the operations files of its Office of Intelligence ("OI") in response to plaintiff's FOIA request because the existence or non-existence of files in the OI is a classified fact under Executive Order 13,526. *Id.* ¶ 9.

After conferring for a period of two weeks following the defendant's production, the plaintiff was not satisfied with the defendant's response, and the parties agreed that dispositive motions were necessary. *See* Joint Status Report ¶¶ 2–3, ECF. 10. The plaintiff does not contest the adequacy of the defendant's search for records responsive to categories (b) and (c) of the plaintiff's FOIA request. *See* Pl.'s Opp'n at 9. Rather, the plaintiff only contests the

appropriateness of the defendant's responses regarding categories (a), (d), and (e).  *Id.*  Pending before the Court are the defendant's Motion for Summary Judgment, ECF No. 11, and the plaintiff's Cross-Motion for Summary Judgment, ECF No. 14.  For the reasons discussed below, the Court grants the defendant's motion and denies the plaintiff's motion.

## II.     STANDARD OF REVIEW

Congress enacted the FOIA to promote transparency across the government.  *See* 5 U.S.C. § 552; *Quick v. U.S. Dep't of Commerce, Nat'l Inst. of Standards & Tech.*, 775 F. Supp. 2d 174, 179 (D.D.C. 2011).  The Supreme Court has explained that the FOIA is "a means for citizens to know 'what their Government is up to.'  This phrase should not be dismissed as a convenient formalism.  It defines a structural necessity in a real democracy."  *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–172 (2004) (citation and internal quotation marks omitted).  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242 (1978).  As a result, the FOIA requires federal agencies to release all records responsive to a request for production.  *See* 5 U.S.C. § 552(a)(3)(A).  Federal courts are authorized under the FOIA "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  *Id.* § 552(a)(4)(B).

This strong interest in transparency must be tempered, however, by the "legitimate governmental and private interests [that] could be harmed by release of certain types of information."  *United Techs. Corp. v. U.S. Dep't of Defense*, 601 F.3d 557, 559 (D.C. Cir. 2010) (internal quotation marks omitted); *see also Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992).  Accordingly, Congress included nine exemptions

permitting agencies to withhold information from FOIA disclosure. *See* 5 U.S.C. § 552(b). "These exemptions are explicitly made exclusive, and must be narrowly construed." *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1262 (2011) (citations and internal quotation marks omitted); *see also Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010) ("FOIA allows agencies to withhold only those documents that fall under one of nine specific exemptions, which are construed narrowly in keeping with FOIA's presumption in favor of disclosure." (citations omitted)).

When a FOIA requester properly exhausts its administrative remedies, it may file a civil action challenging an agency's response to its request. *See* 5 U.S.C. § 552(a)(4)(B); *Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004). Once such an action is filed, the agency generally has the burden of demonstrating that its response to the plaintiff's FOIA request was appropriate. When an agency's response is neither to confirm nor deny the existence of responsive documents—commonly known as a *Glomar* response[3]—the agency "must demonstrate that acknowledging the mere existence of responsive records would disclose exempt information." *Electronic Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012). "In *Glomar* cases, courts may grant summary judgment on the basis of agency affidavits that contain 'reasonable specificity of detail rather than mere conclusory statements, and if they are not called into

---

[3] *Glomar* responses are "named for the *Hughes Glomar Explorer*, a ship used in a classified Central Intelligence Agency project 'to raise a sunken Soviet submarine from the floor of the Pacific Ocean to recover the missiles, codes, and communications equipment onboard for analysis by United States military and intelligence experts.'" *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1171 (D.C. Cir. 2011) (quoting *Phillippi v. CIA*, 655 F.2d 1325, 1327 (D.C. Cir. 1981)).

In the 1986 Freedom of Information Reform Act, Congress codified in § 552(c) the use of a *Glomar* response for the following three limited categories of agency records: (1) law enforcement records described in § 552(b)(7)(A), which if disclosed could reasonably be expected to interfere with enforcement proceedings; (2) informant records; and (3) certain classified records maintained by the FBI. Pub. L. No. 99-570, §§ 1801–04, 100 Stat. 3207, 3207-48 to 3207-50 (1986); *see* 5 U.S.C. § 552(c) (for these excluded categories of records, allowing agencies to "treat the records as not subject to the requirements of this section"); *see also Benavides v. DEA*, 976 F.2d 751, 752–53 (D.C. Cir. 1992) (construing the phrase "not subject to the requirements of this section" to "permit Glomarization where the information's status has not been officially confirmed, but to permit analysis under other exemptions like that afforded any other document sought under FOIA, where the status has been so confirmed"). The defendant does not rely upon § 552(c) here.

question by contradictory evidence in the record or by evidence of agency bad faith.'" *Id.* (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)). "The supporting affidavit must justify the *Glomar* response based 'general exemption review standards established in non-*Glomar* cases.'" *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

## III. DISCUSSION

In this action, the parties have no genuine disputes of material fact. Both parties agree that Ahmad's name has been referenced in connection with the criminal activities of HLF, that Rep. King wrote a letter to the Attorney General regarding a decision not to prosecute Ahmad, and that Attorney General Holder referenced a decision not to prosecute "a guy, a person, an individual." *See* Pl.'s SMF ¶¶ 5, 7; Def.'s SMF Response ¶¶ 5, 7.[4] The parties disagree as to the legal import of those facts. Hence, the Court must consider whether the defendant's refusal to acknowledge the existence or non-existence of responsive records was appropriate under either FOIA Exemptions 5 or 6 and 7(C); and to what extent a *Glomar* response was unavailable because the defendant officially acknowledged the existence of potentially responsive records.[5]

### A. *Glomar* Response Under FOIA Exemption 7(C)

A *Glomar* response is "an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information." *Roth*, 642 F.3d at 1178. Thus, a *Glomar* response allows an agency to respond to a FOIA request by neither confirming nor denying the existence of any records responsive to the request, on the grounds that "confirming or denying

---

[4] The defendant produced the letter from Rep. King to Attorney General Holder, and that letter is publicly available, and so the defendant does not contest the existence or substance of that letter. *See* Brinkmann Decl. Ex. D at 3–4.

[5] As the parties did in their briefing, the Court will consider Exemptions 6 and 7(C) together because the analysis under both is substantially similar. *See, e.g.*, *Coleman v. Lappin*, 680 F. Supp. 2d 192, 196 (D.D.C. 2010) ("With respect to the Court's inquiry into the privacy interests and public interests at stake, the analysis under Exemptions 6 and 7(C) is substantially similar.").

the existence of records would itself 'cause harm cognizable under a[] FOIA exception.'" *Id.* (quoting *Wolf*, 473 F.3d at 374). The responses by the defendant to categories (a), (d), and (e) of the plaintiff's FOIA requests were *Glomar* responses.

FOIA Exemption 6 protects from public disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) similarly protects from public disclosure "records or information compiled for law enforcement purposes . . . [the production of which] could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C). The "harm cognizable" under both exemptions is an "unwarranted invasion of personal privacy," which must be "clear[]" under Exemption 6, but need only "reasonably be expected" under Exemption 7(C). *See id.* §§ 552(b)(6), 552(b)(7)(C). Thus, the ambit of Exemption 7(C) is "somewhat broader" than that of Exemption 6, and therefore if the alleged records at issue here were "compiled for law enforcement purposes," the Court "would have no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)." *Roth*, 642 F.3d at 1173 (internal quotation marks omitted); *see also Am. Civil Liberties Union v. U.S. Dep't of Justice* ("*ACLU*"), 655 F.3d 1, 6 (D.C. Cir. 2011) ("'Exemption 7(C) is more protective of privacy than Exemption 6' and thus establishes a lower bar for withholding material."). Furthermore, "[i]n determining whether the existence of agency records *vel non* fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases." *Wolf*, 473 F.3d at 374. Therefore, the Court will first apply the review standard established for Exemption 7(C) in deciding whether a *Glomar* response was appropriate.[6] Next,

---

[6] The plaintiff does not contest that the records that it seeks would have been "compiled for law enforcement purposes," a prerequisite for application of any part of Exemption 7. *See, e.g.*, *Keys v. U.S. Dep't of Justice*, 830

10

the Court will evaluate the availability of a *Glomar* response for the particular records requested, in light of the plaintiff's contention that the defendant "has previously associated Ahmad with criminal activity." Pl.'s Reply in Supp. Cross-Mot. Summ. J. ("Pl.'s Reply") at 4, ECF No. 20.

"In deciding whether the release of particular information constitutes an 'unwarranted' invasion of privacy under Exemption 7(C), [a court] 'must balance the public interest in disclosure against the [privacy] interest Congress intended the Exemption to protect.'" *ACLU*, 655 F.3d at 6 (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 776 (1989)); *see also Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 893 (D.C. Cir. 1995) ("The courts have construed [Exemption 7(C)] as permitting exemption if the privacy interest at stake outweighs the public's interest in disclosure."). The relevant public interest for purposes of this balancing "focuses on the citizen's right to be informed about what their government is up to," which includes "[o]fficial information that sheds light on an agency's performance of its statutory duties." *Reporters Committee*, 489 U.S. at 773. When, however, "the requester does not intend to discover anything about the conduct of the agency that has possession of the requested records," that public interest is not fostered, and any countervailing privacy interest will prevail. *Id.*; *see also Nat'l Ass'n of Retired Fed. Emps. v. Horner* ("*NARFE*"), 879 F.2d 873, 879 (D.C. Cir. 1989) ("[S]omething, even a modest privacy interest, outweighs nothing every time.").

The D.C. Circuit has recognized that "Exemption 7(C) takes particular note of the strong interest of individuals, whether they be suspects, witnesses, or investigators, in not being associated unwarrantedly with alleged criminal activity." *Dunkelberger v. Dep't of Justice*, 906 F.2d 779, 781 (D.C. Cir. 1990) (internal quotation marks omitted). Thus, "revelation of the fact

---

F.2d 337, 340 (D.C. Cir. 1987) ("[I]n order to prevail on an exemption 7 claim, the government must bear its burden of demonstrating both the threshold law enforcement purpose and the danger that at least one of the specified harms would flow from disclosure.").

that an individual has been investigated for suspected criminal activity represents a significant intrusion on that individual's privacy cognizable under Exemption 7(C)." *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 865 (D.C. Cir. 1981); *see also Nation Magazine*, 71 F.3d at 894 ("[I]ndividuals have an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation."). The D.C. Circuit has recognized that Exemption 7(C) can be an appropriate basis on which to issue a *Glomar* response if merely acknowledging the existence or non-existence of records would constitute an unwarranted invasion of personal privacy. *See, e.g.*, *Roth*, 642 F.3d at 1178; *Nation Magazine*, 71 F.3d at 893.

Here, the plaintiff seeks internal agency records "concerning, regarding, or relating to the prosecution or declination of prosecution of Omar Ahmad," specifically including a "March 31, 2010 memorandum entitled 'Declination of Prosecution of Omar Ahmad' from Attorney General [sic] David Kris to Acting Deputy Attorney General Gary Grindler."[7] *See* Brinkmann Decl. Ex. A, at 1–2; Bradley Decl. Ex. A at 1–2. The defendant argues that such records, if they existed, would clearly "implicate significant privacy interests." Mem. in Supp. Def.'s Mot. Summ. J. ("Def.'s Mem.") at 12, ECF No. 11. The plaintiff, however, relying on the fact that the defendant "on numerous occasions, has already confirmed Ahmad's association with specific criminal activity," argues that whatever privacy interest Ahmad might have once held in the requested information has now evaporated. Pl.'s Opp'n at 12–13. In this regard, the plaintiff also relies heavily on the statement from *Nation Magazine* that, under Exemption 7(C), "a Glomar response may be issued in place of a statement acknowledging the existence of responsive records but withholding them, if confirming or denying the existence of the records

---

[7] David Kris never served as Attorney General of the United States. He served as the Assistant Attorney General for the National Security Division of the Department of Justice from 2009–2011. *See* Mem. in Supp. Def.'s Mot. Summ. J. ("Def.'s Mem.") at 3 n.1, ECF No. 11.

would associate the individual named in the request with criminal activity." 71 F.3d at 893. From this statement, the plaintiff appears to hang its entire legal argument on four critical words inserted in its proposed legal standard: "In other words, a Glomar response under Exemption 7(C) is only proper if a substantive response to the FOIA request would, *for the first time*, associate an individual with criminal activity." Pl.'s Opp'n at 11–12 (emphasis added).

The Supreme Court, however, has long rejected the plaintiff's "cramped notion of personal privacy." *See Reporters Committee*, 489 U.S. at 763. In *Reporters Committee*, the Supreme Court recognized the distinction between "scattered disclosure of the bits of information contained in a rap sheet and revelation of the rap sheet as a whole." *Id.* at 764. Similarly here, there is a distinction between "scattered bits of information" connecting Ahmad to criminal activity and an official prosecutorial record containing a decision not to charge him with a crime. The plaintiff would have the Court waive Ahmad's relevant privacy interests *in toto* based solely on the fact that he has, at one time, been associated with criminal activity. Under the FOIA, however, Ahmad's alleged status as a person who has engaged in prior criminal acts is meaningfully distinct from whether or not he has been the target of criminal prosecution.[8] To reveal that criminal prosecution was contemplated "would announce to the world" that Ahmad was a target for criminal prosecution, and "[t]here can be no clearer example of an unwarranted invasion of personal privacy" than that. *Fund for Constitutional Government*, 656 F.2d at 864 (quoting *Baez v. Dep't of Justice*, 647 F.2d 1328, 1338 (D.C. Cir. 1980)). The

---

[8] Although another FOIA exception permits the official confirmation of a person's status to preclude a *Glomar* response, the same rationale does not apply to Exemption 7(C). *See* 5 U.S.C. § 552(c)(2) (allowing *Glomar* response for requests regarding records that could disclose the identity of a confidential source "unless the informant's status as an informant has been officially confirmed"); *Boyd v. Criminal Div. of U.S. Dep't of Justice*, 475 F.3d 381, 389 (D.C. Cir. 2007) ("Where an informant's status has been officially confirmed, a Glomar response is unavailable, and the agency must acknowledge the existence of any responsive records it holds."); *see also North v. U.S. Dep't of Justice*, — F. Supp. 2d —, No. 08-1439, 2012 WL 4373459 at *4 (D.D.C. Sept. 26, 2012) (holding agency's *Glomar* response improper where "the un-rebutted evidence submitted by the Plaintiff indicat[ed] the DEA publicly acknowledged Starita as an informant during Plaintiff's criminal trial").

revelation that a prosecutor has formally considered criminal prosecution of an individual gives an official imprimatur to that individual's association with criminal activity, which is different—and more intrusive of personal privacy interests—than being publicly associated with criminal activity through individual pieces of information presented in the media or in the criminal prosecutions of others. *Cf. Metoyer v. United States*, 250 F.2d 30, 33 (D.C. Cir. 1957) ("Every citizen has a right to insist that the police make some pertinent and definitive inquiry before he may be arraigned on a criminal charge, which even if it is later abandoned inflicts on him a serious stigma.").

Although public disclosure of a person's association with criminal activity does not waive that person's privacy interests completely, such public disclosure diminishes the person's privacy interests to some degree. *See Reporters Committee*, 489 U.S. at 763 n.15 ("The common law recognized that one did not necessarily forfeit a privacy interest in matters made part of the public record, albeit the privacy interest was diminished . . . ."); *accord ACLU*, 655 F.3d at 9 ("The fact that information about these proceedings is readily available to the public reduces further still the incursion on privacy resulting from disclosure."). Thus, the relevant question here becomes: What incremental privacy interest attaches to the existence or non-existence of government records contemplating the prosecution of Ahmad, independent of the "scattered bits of information" in the public realm that previously associated Ahmad with criminal activity?

The Court need not quantify Ahmad's residual privacy interest, other than to conclude that it is more than nothing, because the plaintiff has not articulated any argument to support a public interest in the disclosure of the records that it seeks. The only hint of the plaintiff's reasoning to support a public interest in this case is the statement in its Complaint that it seeks these records "[d]ue to unanswered questions concerning potential political interference in [the

prosecutorial] decisionmaking process and Defendant's efforts to avoid public scrutiny of that interference." Compl. ¶ 6. Hence, the plaintiff essentially alleges that the defendant improperly scuttled the prosecution of Ahmad for political reasons and that there is a public interest in scrutinizing the alleged declination to prosecute. The Supreme Court has held that "where there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure." *Favish*, 541 U.S. at 174. Rather, because "[a]llegations of government misconduct are 'easy to allege and hard to disprove,'" a requester "must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Id.* at 174–75; *see also Boyd*, 475 F.3d at 388 ("Unsubstantiated assertions of government wrongdoing . . . do not establish 'a meaningful evidentiary showing.'" (quoting *Favish*, 541 U.S. at 175)).

Assuming that the *Favish* standard applies to the public interest outlined by the plaintiff, the only support in the record for the existence of improper political influence comes from two sources. The first is Rep. King's unelaborated assertion in his April 15, 2011 letter to Attorney General Holder that Rep. King was "reliably informed" that the decision not to prosecute Ahmad "was usurped by high-ranking officials at Department of Justice headquarters over the vehement and stated objections of special agents and supervisors of the Federal Bureau of Investigation, as well as the prosecutors at the U.S. Attorney's Office in Dallas." Brinkmann Decl. Ex. D. at 3. The second is the purported statement of an anonymous "high-ranking source within the Department of Justice," reported by Peter Poole, claiming that the decision not to prosecute individuals following the HLF trial was "'a political decision from the get-go.'" *See* Poole Decl.

Ex. A at 1. This does not amount to a "meaningful evidentiary showing," particularly considering that it is directly contradicted by evidence submitted by the plaintiff itself: public statements by the U.S. Attorney for the Northern District of Texas, as well as a former FBI agent who worked on the HLF prosecution, stating that "politics played no role" in determining who would be prosecuted following the HLF prosecution. *See* Bekesha Decl. Ex. I at 1, ECF No. 13-2. On balance, the evidence offered by the plaintiff "would [not] warrant a belief by a reasonable person that the alleged Government impropriety might have occurred," and thus there is no "counterweight on the FOIA scale for the court to balance against the cognizable privacy interests in the requested records." *Favish*, 541 U.S. at 174–75.[9] Therefore, the Court holds that the defendant appropriately issued *Glomar* responses to categories (a), (d), and (e) of the plaintiff's FOIA requests under FOIA Exemption 7(C). *See NARFE*, 879 F.2d at 879 ("[S]omething, even a modest privacy interest, outweighs nothing every time.").[10]

Even assuming, however, that the plaintiff's evidentiary showing were sufficient to meet the "demanding *Favish* standard," *Blackwell v. FBI*, 646 F.3d 37, 41 (D.C. Cir. 2011), Ahmad's privacy interest would almost surely outweigh whatever public interest is asserted by the plaintiff. Although the revelation of agency impropriety is undoubtedly in the public interest, the plaintiff has not articulated how that public interest would be served by merely acknowledging the existence of the March 31, 2010 declination memorandum or other internal correspondence relating to the alleged decision not to prosecute Ahmad. That is, after all, the relevant question when an agency issues a *Glomar* response under FOIA Exemption 7(C): whether the public interest in merely acknowledging the existence or non-existence of a record outweighs any

---

[9] In reaching this conclusion, the Court is mindful that the accuracy of the statements made in Mr. Poole's article is likely "highly questionable considering the not-for-attribution source." *See In re Pierce*, 198 F.3d 899, 905 (D.C. Cir. 1999) (per curiam).

[10] The Court thus need not address whether the defendant's *Glomar* response was appropriate under FOIA Exemptions 5 or 6.


privacy interests implicated by that acknowledgement.  *See, e.g.*, *Nation Magazine*, 71 F.3d at 893.  It is a completely separate question whether disclosing the *contents* of those alleged records would further any public interest, just as it is a separate question whether the records sought by the plaintiff would be subject to disclosure at all.  *See, e.g.*, *Marino v. DEA*, 685 F.3d 1076, 1082 (D.C. Cir. 2012) (distinguishing between "withhold[ing] the *contents* of [a record]" and attempting "to avoid confirming its existence").

Put simply, a decision not to prosecute a person, standing alone, does very little to "shed[] light on the agency's performance of its statutory duties."  *Reporters Committee*, 489 U.S. at 773; *see* AM. BAR ASS'N, ABA Standards for Criminal Justice:  Prosecution and Defense Function 3–3.9 (3d ed. 1993) ("The prosecutor may in some circumstances and for good cause consistent with the public interest decline to prosecute, notwithstanding that sufficient evidence may exist which would support a conviction.").  On the other side of the scale, revealing that an individual was formally considered for criminal prosecution "represents a significant intrusion on that individual's privacy."  *Fund for Constitutional Government*, 656 F.2d at 865.  Thus, balancing these two interests would almost surely confirm the conclusion reached above:  The defendant's *Glomar* responses to categories (a), (d), and (e) of the plaintiff's FOIA requests under FOIA Exemption 7(C) were appropriate.

### B.     Official Acknowledgement of the Decision Not to Prosecute Ahmad

The plaintiff also implicitly argues that the defendant's *Glomar* responses were improper because the defendant "has already disclosed that a decision not to prosecute Ahmad was made." Pl.'s Opp'n at 12.  The D.C. Circuit has recognized that if "the agency has officially acknowledged the existence of [a] record, the agency can no longer use a *Glomar* response, and instead must either:  (1) disclose the record to the requester or (2) establish that its contents are

exempt from disclosure and that such exemption has not been waived." *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (citations omitted); *see also Marino*, 685 F.3d at 1081 ("[I]n the context of a *Glomar* response, the public domain exception is triggered when 'the prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request,' regardless whether the contents of the records have been disclosed." (quoting *Wolf*, 473 F.3d at 379)). Even so, "[a] strict test applies to claims of official disclosure." *Moore*, 666 F.3d at 1333 (alteration in original) (internal quotation marks omitted). "[I]n order to overcome an agency's *Glomar* response based on an official acknowledgement, the requesting plaintiff must pinpoint an agency record that both matches the plaintiff's request and has been publicly and officially acknowledged by the agency." *Id.*

First, even assuming that Ahmad's name appeared on the government's "List of Unindicted Co-Conspirators and/or Joint Venturers" in the HLF prosecution,[11] that would not constitute an official acknowledgement that a prosecutorial decision was made. The plaintiff does not contest that the list was "submitted to lay the groundwork for the possible admission of statements pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence," *see* Def.'s SMF Response ¶ 2, and thus Ahmad's inclusion on the list could have been because he was considered a co-conspirator or because he was merely considered a joint venturer. Under Rule 801(d)(2)(E), the doctrine of admitting hearsay statements of "co-conspirators" is "not limited to unlawful combinations," and it "applies equally in civil and criminal cases." *United States v. Gewin*, 471 F.3d 197, 201–02 (D.C. Cir. 2006). Hence, Ahmad's inclusion on the "List of Unindicted Co-Conspirators and/or Joint Venturers" does not itself reveal that a decision not to prosecute Ahmad was made. Likewise, although Attorney General Holder arguably insinuated in his April

---

[11] As discussed above, the "List of Unindicted Co-Conspirators and/or Joint Venturers" has been filed with the Court under seal, and therefore its contents may not be discussed specifically in this opinion.

26, 2011 press conference that a decision was made not to prosecute Ahmad, mere insinuation does not qualify as official acknowledgement because official acknowledgement requires "exactitude." *See Wolf*, 473 F.3d at 378 (holding that the official acknowledgement doctrine imposes an "insistence on exactitude" under which "the *specific* information sought by the plaintiff must already be in the public domain by official disclosure"); *see also Students Against Genocide (SAGE) v. Dep't of State*, 50 F. Supp. 2d 20, 25 (D.D.C. 1999) ("[T]here is certainly no 'cat out of the bag' philosophy underlying FOIA so that any public discussion of protected information dissipates the protection which would otherwise shield the information sought.").

Furthermore, the anonymous DOJ source cited by Patrick Poole, who allegedly disclosed the existence of the March 31, 2010 declination memorandum, does not constitute an "official acknowledgement" for purposes of overcoming the defendant's *Glomar* response.  Obviously, to qualify as an official acknowledgement, the acknowledgement must be "official," *i.e.*, authorized or approved by the agency in possession of the information being acknowledged.  *See* BLACK'S LAW DICTIONARY 1195 (9th ed. 2009) (defining "official" as "[a]uthorized or approved by a proper authority").  Indeed, a statement by an anonymous agency insider is the exact opposite of an "official acknowledgement" because an anonymous leak is presumptively an unofficial and unsanctioned act.  *See Am. Civil. Liberties Union v. U.S. Dep't of Defense*, 628 F.3d 612, 621–22 (D.C. Cir. 2011) ("'[I]t is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so.'" (quoting *Alfred A Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975))); *Afshar v. Dep't of State*, 707 F.2d 1125, 1130–31 (D.C. Cir. 1983) (distinguishing between "official acknowledgement" of information and "[u]nofficial leaks and public surmise"); *Am. Civil. Liberties Union v. Dep't of Justice*, 808 F. Supp. 2d 280,

297 (D.D.C. 2011) ("[T]he statements of journalists, 'experts,' or even unofficial or unidentified sources (even were they [agency] personnel) are not 'official' disclosures by the [agency]."); *see also Nischnic v. U.S. Dep't of Justice*, 671 F. Supp. 776, 793 (D.D.C. 1987) ("If any public leak or disclosure were sufficient to obliterate the protection afforded by Exemption 7(C), unauthorized disclosures would be encouraged and rewarded.").

Therefore, the plaintiff has not demonstrated that the defendant ever officially acknowledged the existence of a decision not to prosecute Ahmad or any records related to that decision. As a result, the plaintiff cannot overcome the defendant's otherwise proper invocation of FOIA Exemption 7(C) to issue *Glomar* responses to categories (a), (d), and (e) of the plaintiff's FOIA requests, and therefore the defendant is entitled to summary judgment.

## IV. CONCLUSION

For the reasons discussed above, the defendant's Motion for Summary Judgment will be GRANTED, and the plaintiff's Cross-Motion for Summary Judgment will be DENIED. An appropriate Order accompanies this Memorandum Opinion.

Date: October 12, 2012

                                                  /s/ *Beryl A. Howell*
                                                  BERYL A. HOWELL
                                                  United States District Judge